SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## Christopher J. Gramiccioni v. Department of Law and Public Safety
### (A-21-19) (083198)

**Argued March 31, 2020 -- Decided July 28, 2020**

**LaVECCHIA, J., writing for the Court.**

In these consolidated appeals, the Court examines whether the Department of Law and Public Safety's (Department) four final agency determinations regarding defense and indemnification for federal civil rights claims filed against the Monmouth County Prosecutor's Office and its employees were in keeping with Wright v. State, 169 N.J. 422 (2001).

This case stems from the 2015 murder of Tamara Wilson-Seidle by her ex-husband, Philip Seidle, an off-duty sergeant with the Neptune Township Police Department, using his service weapon. Wilson-Seidle's estate and survivors filed a complaint under 42 U.S.C. § 1983 in federal court, naming several defendants, including the Monmouth County Prosecutor's Office (MCPO) and Monmouth County Prosecutor Christopher Gramiccioni, and an amended pleading that added as defendants three former MCPO assistant prosecutors. The Complaint alleged that defendants were aware of Seidle's history of domestic violence and brought claims for damages based on assertions that defendants knew Seidle was unfit for duty, failed to properly investigate Wilson-Seidle's domestic abuse complaints, improperly returned Seidle's weapon to him, and failed to seize it when it should have been taken from him. Because the domestic violence that gave rise to this matter involved a law enforcement officer, the MCPO defendants were subject to certain duties pursuant to Attorney General Law Enforcement Directive No. 2000-3 (the Directive).

After the Complaint and the First Amended Complaint were filed, the MCPO defendants sent written requests to the Office of the Attorney General requesting representation and indemnification for any and all allegations against them pursuant to Wright. In the first letter-decision, the Attorney General agreed to defend and indemnify the MCPO defendants for allegations perceived to concern the MCPO's law enforcement functions, but declined to defend them for allegations that were determined not to relate to the detection, investigation, arrest, or prosecution of criminal defendants and, thus, to constitute merely administrative functions. In the

second letter, which addressed the Amended Complaint, the Attorney General declined entirely to represent and indemnify the MCPO defendants, despite the inclusion of several claims that the Attorney General's first letter-determination had already agreed to defend and indemnify. The Attorney General also declined to defend and indemnify the MCPO defendants with respect to the Second Amended Complaint and the Third Amended Complaint because the claims asserted therein pertained to administrative functions.

The MCPO defendants appealed and the Appellate Division concluded that the Attorney General properly differentiated between law enforcement and administrative functions with respect to the original complaint but erred when not consistently applying that approach to the subsequent complaints. The appellate court found that compliance with the Directive was an administrative function not subject to defense and indemnification. The Appellate Division remanded the matter to the Law Division to determine the reimbursement due for the portion of costs associated with defense of claims for which the Attorney General inconsistently denied coverage.

The Court granted certification. 240 N.J. 65 (2019).

**HELD:** All claims related to the MCPO defendants' acts or alleged omissions associated with duties imposed by the Directive constitute state prosecutorial functions. The Department's parsing of the pleadings in this matter led to crabbed determinations about the scope of law enforcement activity that are inconsistent with the letter and purpose of Wright. The Court finds the Department's four determinations -- which reflect shifting and conflicting positions -- to be arbitrary and unreasonable.

1. In Wright, the Court determined that county prosecutors occupy a "hybrid" role, serving both the county and the State, and undertook the task of clarifying when the State must defend and indemnify county prosecutors and their employees. 169 N.J. 455-56. The Wright Court held that the State could be held vicariously liable for the tortious conduct of county prosecutors and their subordinates during their investigation and enforcement of the State's criminal laws, and further that the State should be obligated to pay their defense costs and to indemnify them if their alleged misconduct involved a State law enforcement function. Id. at 430. The Court articulated two purposes advanced by its holding: it eliminated uncertainty for county prosecutors as to whether defense and indemnification would be provided, and it avoided the anomalous results that could occur based on the State's potential for vicarious liability for the same actions. Id. at 455-56. Importantly, that reasoning supported the Court's decision to put the State in control of the defense in such settings. Id. at 456. Attempts to implement that holding -- and in particular its exclusion of administrative functions from indemnification -- have given rise to a

2

number of disputes over the years. Cases in which courts correctly have found that the State did not need to indemnify and defend county prosecutors have involved internal operations of a prosecutor's office. (pp. 23-30)

2. Applying those principles here, it appears that two categories of error plagued the Attorney General's approach to the requests for defense and indemnification. First, the Attorney General, and the Appellate Division, did not give proper regard to the nature of the Directive, which imposes on the county prosecutor numerous, important discretionary decisions related to the removal and return of service weapons by law enforcement officers within their jurisdiction. The prosecutor's office must offer training and supervision with respect to enforcement of the Directive. The Court views that training and supervision, as well as the many discretionary determinations the Directive assigns to the prosecutor, as part of the State-delegated responsibility to enforce the law that the Attorney General has entrusted to prosecutors, rather than as administrative duties that have been exempted from State defense and indemnification in the past. The decisions of the MCPO defendants who considered whether Seidle could be re-armed and then remain armed were prosecutorial functions exercised on behalf of the State. As such, those determinations, as well as the claims of improper training and supervision of Neptune law enforcement with respect to implementation of the Directive, were entitled to defense and indemnification by the State. (pp. 30-35)

3. The second error permeating the decisions under review is the manner in which the Attorney General parsed each iteration of the complaint, scouring them paragraph by paragraph, at times within a paragraph, to eliminate bases for defense and indemnification. That crabbed approach toward the provision of defense and indemnification is not in keeping with the thrust of Wright. The prosecutorial function should be covered, and the State is given control over the whole defense to ensure that it is not compromised by lack of coordination, or worse, inconsistency in position. The Attorney General's inconsistency in its review of these sequentially filed complaints renders the decisions arbitrary and unreasonable. (pp. 35-36)

4. The Court agrees with the Appellate Division that on remand a trial court should assess the reimbursement due to petitioners. (p. 36)

**The judgment of the Appellate Division is REVERSED and this matter is REMANDED to the Law Division for proceedings consistent with this opinion.**

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion.**

3

SUPREME COURT OF NEW JERSEY

A-21 September Term 2019

083198

Christopher J. Gramiccioni,

Petitioner-Appellant,

v.

Department of Law and Public Safety,

Respondent-Respondent.

_____

Gregory J. Schweers,
Jacquelynn F. Seely and
Richard E. Incremona,

Petitioners-Appellants,

v.

Department of Law and Public Safety,

Respondent-Respondent.

_____

Monmouth County Prosecutor's Office,
Christopher J. Gramiccioni,
Gregory J. Schweers,
Jacquelynn F. Seely, and
Richard E. Incremona,

Petitioners-Appellants,

v.

1

Department of Law and Public Safety,

Respondent-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| March 31, 2020 | July 28, 2020 |

Robyn B. Gigl argued the cause for appellants (GluckWalrath, attorneys; Michael D. Fitzgerald, of counsel, and Robyn B. Gigl and Victoria A. Flynn, of counsel and on the briefs).

Daniel M. Vannella, Assistant Attorney General, argued the cause for the respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel, and Daniel M. Vannella, on the brief.)

Stephen C. Sayer, Cumberland County Assistant Prosecutor, submitted a brief on behalf of amicus curiae County Prosecutors Association of New Jersey (Francis A. Koch, Sussex County Prosecutor, President, attorney; Stephen C. Sayer, of counsel and on the brief).

JUSTICE LaVECCHIA delivered the opinion of the Court.

When federal civil rights claims were filed against the Monmouth County Prosecutor's Office and its employees, they sought defense and indemnification by the State. The Department of Law and Public Safety (the Department) conducted a per-paragraph and per-claim analysis of the

plaintiffs' pleadings to determine which claims implicated law enforcement activity -- and were accordingly entitled to State defense and indemnification -- and which did not. In these consolidated appeals, we examine whether the Department's four final agency determinations regarding indemnification in this matter -- one determination for the original complaint and one for each of the three amended versions of the complaint -- were in keeping with Wright v. State, 169 N.J. 422 (2001).

In Wright, this Court held that when county prosecutors and their employees are involved in law enforcement functions under general State supervisory authority, the State should bear the responsibility for defense and indemnification for litigation generated by such activities. Id. at 456. The Wright Court saw a two-fold purpose to its holding: ensuring defense and indemnification coverage for law enforcement activities conducted by county prosecutors; and avoiding anomalous results due to the State's potential for vicarious liability. Id. at 455-56. Accordingly, Wright put the State in full and complete control of the defense in such settings. Id. at 456.

The Department's parsing of the pleadings in this matter led to crabbed determinations about the scope of law enforcement activity that are inconsistent with the letter and purpose of Wright. And we find the Department's four determinations -- which reflect shifting and conflicting

3

positions -- to be arbitrary and unreasonable. Because the alleged acts and omissions that gave rise to the suit against the members of the Prosecutor's Office were tied to their law enforcement responsibilities, as explained below, we reverse and remand for the assessment of defense costs.

I.

A.

This case stems from a terrible tragedy: the July 16, 2015 murder of Tamara Wilson-Seidle by her ex-husband, Philip Seidle, using his service weapon. The following facts about that event are drawn from the pleadings and related motion filings from the civil litigation that followed after Wilson-Seidle's death.

At the time of the murder, Philip Seidle was an off-duty sergeant with the Neptune Township Police Department. The couple had married in 1990 and had nine children together, but their marriage was marred by domestic violence. Wilson-Seidle reported several incidents of domestic abuse by Seidle to the Neptune Township Police Department for two reasons: Neptune Township is the town in which she lived, and Seidle was employed by the Neptune Township Police Department. In 2012, Wilson-Seidle filed for divorce, and Seidle moved out of the family home. However, after the couple separated, Wilson-Seidle continued to make documented domestic violence or

4

other incident calls to Neptune Township law enforcement about harassment and threats by Seidle.

As would later be alleged in the resulting federal civil action, Seidle had a history of mental instability and anger management issues, and was unfit for duty -- all of which defendants allegedly knew. There were at least six domestic violence calls placed to the Neptune Township Police Department either by Wilson-Seidle or Seidle himself, involving a slew of issues resulting from the divorce, including Seidle's attempts to violate a separation/custody order, fights over visitation, and Seidle's threatening, harassing, and intimidating actions toward Wilson-Seidle.

As a result of one incident involving Wilson-Seidle, Seidle had his firearm taken away from him in 2012 by the Neptune Township Police Department and the Monmouth County Prosecutor because he was deemed unfit for duty. Seidle's weapon was returned to him about eleven months later, despite questions about his continued instability. Seidle was disciplined again in 2013, and was then again disciplined, reprimanded, and suspended for a short period in 2014 because of a domestic violence incident involving Wilson-Seidle.

As a result of Seidle's various actions towards her, Wilson-Seidle informed the Neptune Township Police Department in late 2014 of the abuse

5

and harassment she was experiencing. Instead of acting to remove Seidle's service and personal weapons due to Wilson-Seidle's continued complaints, the Neptune Township Police Department kept Seidle in its employ and permitted him to have access to his service weapon. After Wilson-Seidle's 2014 complaint, there was at least one more documented incident of alleged domestic violence, approximately forty-five days before the fatal shooting. Despite that incident report, Seidle remained employed and armed by the Neptune Township Police Department.

While driving on the night of July 16, 2015, Wilson-Seidle received a threatening telephone call from Seidle. Based on Seidle's incredibly angry demeanor during the call, Wilson-Seidle was frightened that he would kill her. Wilson-Seidle notified a daughter of her fear and that Seidle was following her car; her daughter immediately placed a call to 9-1-1. In the meantime, Seidle began ramming his car into his ex-wife's vehicle, ultimately forcing her to pull her car to the side of the road. He exited his vehicle, pulled out his service weapon, and began firing into the car at Wilson-Seidle.

Shortly after the first shots were fired, a younger daughter ran from Seidle's car to a nearby local law enforcement officer, who transmitted a "shots fired" report. Several officers responded to the scene and, for a period of about thirteen minutes, there was a standoff between Seidle and law

6

enforcement, during which Seidle reportedly placed a gun to his head and threatened to kill himself. Wilson-Seidle died of the wounds inflicted by her former husband that day. Seidle was taken into custody.

B.

After Wilson-Seidle's death, her estate and survivors filed a complaint under 42 U.S.C. § 1983 in federal court, which named as defendants Neptune Township, the Neptune Township Police Department, the Monmouth County Prosecutor's Office (MCPO), and Monmouth County Prosecutor Christopher Gramiccioni. Shortly thereafter, plaintiffs filed an amended pleading that added as defendants three former MCPO assistant prosecutors: Gregory J. Schweers, Jacqueline F. Seely, and Richard E. Incremon.

The Complaint alleged that defendants were aware of Seidle's long and well-documented history of domestic violence. Based on the assertions that defendants knew Seidle was unfit for duty, failed to properly investigate Wilson-Seidle's domestic abuse complaints, improperly returned Seidle's weapon to him, and failed to seize it when it should have been taken from him, plaintiffs brought claims for damages.

Our focus in this matter is on the request for defense and indemnification of the damages claims against the prosecutor's office defendants, who are petitioners here. Those defendants were subject to certain duties pursuant to

7

an Attorney General Directive because the domestic violence that gave rise to this matter involved a law enforcement officer.

Plaintiffs allege that the MCPO, County Prosecutor Gramiccioni, and the individual prosecutor's office defendants (collectively, the MCPO defendants) were responsible for the

> operation, management, supervision and control over the investigation, and presentation of criminal matters brought by the State against persons charged with crimes, but who also ha[d] responsibility over investigative and non-judicial or advocacy functions including but not limited to the review of weapons seizures and issues involving domestic violence involving or relating to law enforcement officers and the handling of domestic violence incidents as well as determining the conditions under which weapons may be seized or returned and oversight over the reinstatement of weapons to an officer and/or termination of officers and/or conditions of employment with respect to the use of service and personal weapons . . . .

Further, plaintiffs allege that those defendants were persons "who had authority, control and supervision over Philip Seidle while he was employed by Neptune and/or decisions and control over the seizure and return of weapons and reinstatement of Seidle as well as determinations over conditions involving Seidle's use and control over weapons, including service weapons."

8

Plaintiffs specifically assert that the MCPO defendants "failed to properly supervise, monitor, train, retain and discipline . . . officers" in connection with their handling of domestic violence and use of force, and that they permitted Seidle to remain a law enforcement officer despite a well-documented history of "mental instability, fitness for duty problems, temperament, emotional and psychological problems requiring anger management," and a long and consistent history of domestic violence against Wilson-Seidle and her children.

The Complaint and First Amended Complaint allege that Seidle was disciplined and suspended in 2012 for cancelling a dispatch call from Wilson-Seidle related to domestic violence and that Seidle was permitted to return to work although defendants had full "knowledge of his anger problems and psychological instability, along with known and continuing threats to [Wilson-Seidle]." Seidle was again disciplined for performance-related problems in 2013, but was permitted to keep his weapons. Yet again in March 2014, Seidle was disciplined, reprimanded, and suspended for harassing and threatening Wilson-Seidle, and the MCPO defendants are alleged to have been put "on notice of still more threats of physical harm, emotional outbursts, [and] menacing and harassing behavior by Seidle" toward his ex-wife.

9

After the original Complaint was filed, and then again when the First Amended Complaint was filed, written requests were sent to the Office of the Attorney General, Department of Law and Public Safety, requesting representation and indemnification of the MCPO defendants for any and all allegations against them pursuant to Wright.

The Attorney General, on behalf of the Department, submitted a written decision in response to each of the two requests. In his responses, the Attorney General agreed to defend and indemnify the MCPO defendants for allegations that the Attorney General perceived to concern the MCPO's law enforcement functions. However, the Attorney General declined to defend defendants for allegations that were determined not to relate to the detection, investigation, arrest, or prosecution of the criminal defendants and, thus, to constitute merely administrative functions. The Attorney General's written responses did not provide further reasoning or explanation why the specific actions were designated as they were.

In the first letter-decision, dated July 6, 2017, which concerned the initial Complaint, the Attorney General advised the County Prosecutor that the State would provide defense and indemnification for some, but not all, asserted claims. Relying on Wright, the Attorney General stated that the State would "defend and indemnify the [MCPO] Defendants against any claims related to

10

their engagement in classic criminal law enforcement activities: detection, investigation, arrest, and prosecution of criminal defendants." Accordingly, the Attorney General agreed to defend and indemnify defendants concerning the following allegations:

- failing to conduct a criminal investigation (including failing to monitor evidence of stalking, failing to conduct a proper internal affairs investigation and failing to prohibit discriminatory or disparate treatment of Tamara [Wilson-]Seidle) and prosecute Philip Seidle[;]

- failing to provide law enforcement protection to a victim of domestic violence[;]

- failing to respond properly at the scene[;]

- failing to supervise at the scene[;]

- failing to file (or assist Tamara Wilson-Seidle in filing) a restraining order against Philip Seidle[; and]

- failing to follow the New Jersey Attorney General Guidelines to the extent the claim alleges a failure to conduct a criminal investigation and/or prosecute[.]

However, the Attorney General "decline[d] representation and indemnification related to the allegations in the Complaint that are administrative in function," namely:

11

- failing to properly supervise, monitor, train, retain and discipline officers[;]

- permitting and allowing Philip Seidle to remain employed[;]

- permitting and allowing Philip Seidle to possess a service weapon, or any weapon[;]

- failing and refusing to keep Philip Seidle disarmed[;]

- permitting Philip Seidle to be reinstated[;]

- failing to follow the New Jersey Attorney General Guidelines for handling domestic violence complaints and incidents involving law enforcement (with exception of any claim for failure to conduct a criminal investigation and/or prosecute)[;]

- returning Philip Seidle's service weapon[; and]

- failing to conduct an administrative investigation[.]

The Attorney General concluded that those "allegations do not arise out of the [MCPO] Defendants' 'classic' law enforcement duties as defined by the Supreme Court in Wright -- the detection, investigation, or prosecution of the State's criminal laws." Instead, the Attorney General found that those "allegations challenge the [MCPO] Defendants['] administrative

12

responsibilities and actions," and that the State was therefore not required to offer representation or indemnification against those allegations under Wright.

In the second letter, dated October 27, 2017, which addressed the Amended Complaint, the Attorney General declined entirely to represent and indemnify the MCPO defendants, despite the Amended Complaint's inclusion of several claims that the Attorney General's first letter-determination had already agreed to defend and indemnify. Despite the similarity in claims, the Attorney General cryptically stated that "the claims asserted in the Amended Complaint against the [MCPO] Defendants arise out of the performance of administrative functions," and concluded that the State would not provide a defense because the "allegations do not arise out of the [MCPO] Defendants['] 'classic' law enforcement duties."

Each of those two final agency decisions were appealed to the Appellate Division, where they were consolidated for appellate review.

While those appeals were pending, the United States District Court for the District of New Jersey dismissed the Amended Complaint without prejudice and granted leave for plaintiffs to re-plead the claims. In doing so, the court dismissed the State of New Jersey as a named defendant from the action, with prejudice, because plaintiffs conceded that they could not maintain

13

a § 1983 suit against the State.[1]  Further, the court dismissed, with prejudice, the Monmouth County Prosecutor's Office and Prosecutor Gramiccioni for claims brought against them "in their official capacities, and in connection with their law enforcement and investigatory functions" because, the court said the claims involved state action and the State is not a "person" amenable to suit under a § 1983 claim.

In allowing the plaintiffs the opportunity to file a Second Amended Complaint, the court directed that they provide clearly the "who, what, when, and wheres" specific to each defendant.  The court declined to identify which actions plaintiffs were seeking to pursue might involve administrative as opposed to investigative/law enforcement functions.  In its decision, the court stated that "if there is a dispute as to whether a certain decision was an investigatory or law enforcement decision, and Plaintiffs can plausibly plead that it was not state action, Plaintiffs may include such a claim in the Amended Complaint."

Plaintiffs then filed a Second Amended Complaint, which continued to include several allegations that appeared to implicate the MCPO defendants' law enforcement duties, in addition to new claims.  Again, the MCPO

---

[1]  See Royster v. State Police, 227 N.J. 482, 494 (2017).

14

defendants requested that the Attorney General represent and indemnify in the action.

On August 2, 2018, the Attorney General declined, in a third letter, highlighting that the district court "dismissed all claims against the [MCPO] Defendants in their official capacities and in connection with their law enforcement and investigatory functions with prejudice." Specifically, the Attorney General noted that

> the claims asserted in the Second Amended Complaint pertain to administrative functions for which this Office denied representation in connection with the initial Complaint . . . . Accordingly, the Attorney General's Office respectfully denies representation and indemnification to the [MCPO] Defendants with regard to the Second Amended Complaint.

Defendants appealed that determination and filed a Motion to Consolidate that appeal with the two pending appeals.

On December 11, 2018, the federal court dismissed the Second Amended Complaint, largely because the pleadings lacked particularity. In January 2019, plaintiffs filed the Third Amended Complaint, which more precisely identified which claims were asserted against which defendants and the conduct on which each claim was based. The Third Amended Complaint also asserted that "[a]t all relevant times, [the MCPO defendants] were acting in an administrative capacity as opposed to [a] law enforcement or investigatory

15

function and subject to the supervision and control of the County as opposed to the State." The MCPO defendants then submitted a fourth request for representation to the Attorney General.

In response to that fourth request, the Attorney General reiterated that the Department had specifically declined to defend the MCPO defendants against allegations deemed to arise out of an administrative function and noted that, in the Third Amended Complaint, plaintiffs "once again assert[] claims pertaining to administrative functions for which this office denied representation in the initial and Second Amended Complaints." Accordingly, the Attorney General denied representation and indemnification for the Third Amended Complaint, and the MCPO defendants appealed.

C.

All four of the appeals from the Department's determinations were consolidated and addressed by the Appellate Division in an unpublished decision.

After noting that the Attorney General's administrative determination was subject to a deferential standard of review, citing Lavezzi v. State, 219 N.J. 163, 171 (2014), the Appellate Division then ruled on each determination, relying on the guidance provided in Wright, Lavezzi, and Attorney General Law Enforcement Directive No. 2000-3 (the Directive), in which the Attorney

16

General provided guidelines to law enforcement concerning steps to be taken when a law enforcement officer is involved in a domestic violence incident.

The Appellate Division ultimately concluded that the Attorney General properly differentiated between law enforcement and administrative functions with respect to the original complaint but erred when not consistently applying that approach to the subsequent complaints.

The court explained that

> [p]rosecutors have two separate obligations pertaining to a police officer alleged to have committed domestic violence. One is classic law enforcement, i.e., the obligation to investigate and enforce criminal laws, including instances of domestic violence. N.J.S.A. 2C:25-19. The second is the obligation to maintain control over the weapons seized from officers and to determine when and if the officers should be re-armed and allowed to serve as an officer.

With respect to the latter obligation, notwithstanding the existence of the Attorney General's specific guidance set out by the Directive concerning law enforcement officers, the court found the issue of defense and indemnification to be controlled by N.J.S.A. 2C:25-21(d)(1), which broadly covers all seized weapons from any domestic violence perpetrator and their ultimate return to their owner via a civil proceeding. That, the Appellate Division reasoned, was an administrative function, and so the court determined that compliance with the Directive, and re-arming Seidle, was an administrative duty because it

17

related to the same core function required of county prosecutors under N.J.S.A. 2C:25-21(d)(1). Applying that reasoning, the Appellate Division reached the following conclusions.

### 1. First Agency Determination

The Appellate Division stated that the MCPO defendants were required to oversee the return of Seidle's service weapons pursuant to the Directive, but concluded that "compliance with the Directive related to appellants' administrative duties." Further, the court concluded that "[t]he allegations pertaining to the failure to supervise, monitor, train, retrain and discipline and Seidle's continued employment also fall into the administrative category." Thus, the court affirmed in all respects the Attorney General's First Agency Determination.

### 2. Second Agency Determination

Turning to the second appeal, which relates to the First Amended Complaint, the Appellate Division essentially directed that the Attorney General had to act consistently with respect to functions previously determined to be law enforcement functions.[2]

---

[2] The Appellate Division treated this determination as if it applied the same differentiated approach to administrative versus law enforcement duties applied in the first determination. However, the Attorney General's second determination reads as a complete ban on defense and indemnification for the Amended Complaint's claims.

18

### 3. Third Agency Determination

Addressing the third Attorney General determination, the Appellate Division noted that the Second Amended Complaint contains at least twenty claims that the Attorney General agreed to defend and indemnify in its first decision and then later declined to cover. The Appellate Division cited specific examples of such inconsistency, including a paragraph present in the Complaint and the first two amended versions alleging that the MCPO defendants, acting under the authority of State law, deprived Wilson-Seidle of a constitutional right to liberty, substantive and procedural due process, and equal protection by a series of enumerated actions or omissions.[3] The Attorney General's first decision agreed to indemnify and defend against those claims when they were presented in the original Complaint and yet, despite the claims' being re-pled, the Attorney General later declined coverage. The same occurred with respect to an allegation that defendants failed in their duty to take all reasonable efforts to provide law enforcement protection to victims of domestic violence.[4]

---

[3] See Paragraph 27(d) of the Complaint and Paragraph 29(d) of both the First and the Second Amended Complaints.

[4] See Paragraph 85 of the Complaint, Paragraph 87 of the First Amended Complaint, and Paragraph 100 of the Second Amended Complaint.

The Appellate Division determined that the aforementioned inconsistency could not be sustained and required coverage for the claims the Department initially agreed to defend and indemnify.

4. Fourth Agency Determination

Finally, the Appellate Division highlighted that the Attorney General's blanket denial of defense and indemnification for all claims in plaintiffs' Third Amended Complaint was error, again highlighting that the Attorney General "overlooked portions of the third amended complaint where allegations it originally agreed to provide defense and indemnification were scattered among different areas of the complaint."

For purposes of developing a proper remedy, the Appellate Division remanded this matter to the Law Division to determine the reimbursement due for the portion of costs associated with defense of claims for which the Attorney General inconsistently denied coverage after initially having agreed, correctly, that they involved law enforcement functions. Before remand proceedings took place, this appeal ensued.

II.

We granted the petition for certification filed by the MCPO defendants (hereinafter petitioners), 240 N.J. 65 (2019), and we granted amicus curiae status to the County Prosecutors Association of New Jersey (CPANJ).

20

## A.

According to petitioners, the Appellate Division erred in concluding that compliance with the Directive did not constitute a law enforcement function.

Petitioners contend that the Appellate Division erred in relying on N.J.S.A. 2C:25-21(d)(1), which deals with law enforcement's role in delivering handguns seized from members of the general public, and ignoring the clear language of the Directive, which applies specifically when law enforcement personnel are accused of domestic violence. They maintain that the supervision of officers in this context is law enforcement, highlighting the discretion that the county prosecutor has when deciding whether to return weapons to a law enforcement officer -- discretion that does not apply when it comes to the return of weapons to a member of the general public.

Further, petitioners assert that the Appellate Division erred in finding that supervision and training constitutes an administrative function, citing as persuasive authority Van de Kemp v. Golstein, 555 U.S. 335 (2009).

Finally, petitioners assert that the Attorney General's coverage determinations were arbitrary and capricious in execution, as illustrated by the different treatment given to identical paragraphs from one iteration of the complaint to another. Petitioners also argue that, through its parsing of not only the Complaint, but also individual paragraphs within the Complaint, the

21

Attorney General created distinctions between related conduct that impeded the MCPO defendants' ability to mount a consistent defense and properly frame an argument.

Amicus curiae CPANJ agrees that the Appellate Division erred when it found that actions governed by the Directive did not constitute a law enforcement function. CPANJ maintains that under Wright "an administrative act by a county prosecutor that will not be entitled to indemnification from the State must be an act that is unrelated to its prosecutorial functions." CPANJ asserts that the State must provide defense and indemnification for county prosecutors and their employees when actions are clearly taken on "behalf of and with accountability to the State." It argues that the Directive acts with the force of law in guiding law enforcement in how to handle the return of service weapons to law enforcement personnel after such weapons are seized as a result of domestic violence and that compliance with the Directive is thus a law enforcement function. Here, Seidle's service weapon was removed pursuant to the Directive and returned to him pursuant to the same. As a result, the CPANJ argues, the State should provide defense and indemnification.

B.

In urging affirmance of the Department's determinations sustained by the Appellate Division, the Attorney General does not challenge Wright and relies on its differentiation between administrative and law enforcement functions. The Attorney General expresses concern that under petitioners' assertions, any actions taken by a county prosecutor's office could be said to be a law enforcement function, expanding the State's obligation to defend and indemnify county prosecutors for matters the Attorney General asserts are properly categorized as administrative.

III.

A.

The State's obligation to defend and indemnify county prosecutors and their employees for actions arising out of their employment stems from the Tort Claims Act (the TCA), N.J.S.A. 59:1-1 to 12-3. The TCA governs tort suits filed against the State and public entities, and it sets forth defense and indemnification provisions that distinguish between State employees and other public employees. Our jurisprudence documents that well-known statutory structure. See Kaminskas v. Office of the Attorney Gen., 236 N.J. 415, 423 (2019). The instant appeal zeroes in on the interpretation of that scheme by this Court's seminal decision in Wright.

23

Pertinently, the TCA provides, subject to exceptions inapplicable here,[5] that the Attorney General <u>shall</u> provide for the defense and indemnification of all State employees, upon a request, for "act[s] or omission[s] in the scope of [their] employment." N.J.S.A. 59:10-1; :10A-1. The "State," as defined, does not include other "sue and be sued" public entities. N.J.S.A. 59:1-3. Public entities may indemnify their employees. N.J.S.A. 59:10-4 (empowering public entities to indemnify their employees for "damages resulting from the employee's civil violation of State or federal law if, in the opinion of the governing body of the local public entity, the acts committed by the employee upon which the damages are based did not constitute actual fraud, actual malice, willful misconduct or an intentional wrong"). Although not mandatory, <u>see, e.g.</u>, <u>Marion v. Borough of Manasquan</u>, 231 N.J. Super. 320, 335 (App. Div. 1989), the Comment to N.J.S.A. 59:10-4 indicates that such optional indemnification is encouraged. <u>Accord</u> <u>Wright</u>, 169 N.J. at 455. That lack of definiteness affected the decision reached in <u>Wright</u>.

B.

1.

In <u>Wright</u>, this Court determined that county prosecutors occupy a "hybrid" role, serving both the county and the State, and undertook the task of

---

[5] <u>See</u> N.J.S.A. 59:10-2.

24

clarifying when the State must defend and indemnify county prosecutors and their employees. Id. at 455-56.

Wright involved a claim by members of the Somerset County Prosecutor's Office (SCPO) for defense and indemnification in a lawsuit based in tort filed by Isaac Wright, who had been prosecuted by employees of the SCPO and was found, in a post-conviction relief proceeding, to have been the subject of improper actions by various members of that office, including "high-ranking Somerset County law-enforcement officials" and the former Somerset County Prosecutor. Id. at 430-31. The Attorney General refused Somerset County's request to provide representation and indemnification. Id. at 432. That refusal was ultimately reviewed by this Court, as well as whether the State could be held vicariously liable for the actions of the SCPO. Id. at 432, 434.

The Wright Court held that the State could be held vicariously liable for the tortious conduct of county prosecutors and their subordinates during their investigation and enforcement of the State's criminal laws, and further that the State should be obligated to pay their defense costs and to indemnify them if their alleged misconduct involved a State law enforcement function. Id. at 430; see also id. at 455.

Specifically, the Wright Court stated:

25

We acknowledge that the Legislature intended a sharp distinction between State employees and employees of other public entities that may be indemnified by such entities, but that distinction did not contemplate public employees, such as county prosecutors, who have a hybrid status. We are persuaded that the statutory language used in N.J.S.A. 59:1-3 did not take into account the unique role of county prosecutorial employees, paid by the county, but performing a State law enforcement function under State supervisory authority. To vindicate the legislative purpose of providing defense and indemnification to public employees performing an essential State function, we interpret the defense and indemnification provisions of the TCA to apply to county prosecutorial employees sued on the basis of actions taken in the discharge of their law enforcement duties.

[169 N.J. at 455-56.]

As noted, the <u>Wright</u> Court articulated two purposes advanced by its holding: it eliminated uncertainty for county prosecutors as to whether defense and indemnification would be provided, and it avoided the anomalous results that could occur based on the State's potential for vicarious liability for the same actions. <u>Ibid.</u> Importantly, that reasoning supported the Court's decision to put the State in control of the defense in such settings. <u>Id.</u> at 456.

Although <u>Wright</u>'s holding strove, in part, to eliminate uncertainty, attempts to implement that holding -- and in particular its exclusion of administrative functions from indemnification -- have given rise to a number

26

of disputes over the years. We therefore consider what <u>Wright</u> and later cases illuminate about that exclusion.

2.

The <u>Wright</u> Court provided an example to illustrate the distinction it established between law enforcement activities and administrative activities. It quoted a recent holding by the Third Circuit to show how to distinguish the excluded "administrative functions" from prosecutorial functions deserving of State defense and indemnification:

> [W]hen county prosecutors execute their sworn duties to enforce the law by making use of all the tools lawfully available to them to combat crime, they act as agents of the State. On the other hand, when county prosecutors are called upon to perform administrative tasks unrelated to their strictly prosecutorial functions, such as a decision whether to promote an investigator, the county prosecutor in effect acts on behalf of the county that is the situs of his or her office.
>
> [<u>Id.</u> at 454 (quoting <u>Coleman v. Kaye</u>, 87 F.3d 1491, 1499 (3d Cir. 1996)).]

To further assist in distinguishing the two settings, the Court said that the test for determining in which capacity a county prosecutor acts should "focus on whether the function that the county prosecutors and their subordinates were performing during the alleged wrongdoing is a function that traditionally has

27

been understood to be a State function and subject to State supervision in its execution." Ibid.

Thus, cases in which courts correctly have found that the State did not need to indemnify and defend county prosecutors have involved, as petitioners argue, internal operations of a prosecutor's office. Coleman, 87 F.3d at 1499 (dispute involving the denial of a promotion), and DeLisa v. County of Bergen, 326 N.J. Super. 32 (App. Div. 1999) (involving a retaliatory discharge claim), rev'd on other grounds, 165 N.J. 140 (2000), were employment actions. Similarly, Courier News v. Hunterdon County Prosecutor's Office, 378 N.J. Super 539 (App. Div. 2005), concerned a prosecutor's office's alleged failure to comply with the Open Public Records Act, an administrative obligation of all public entities subject to that law. Not all circumstances are as clear cut, however.

In Lavezzi, this Court was called on to assess an unusual circumstance bearing some indicia of both a state law enforcement function and the administrative function of housing, securely and safely, seized evidence. 219 N.J. at 166. The appeal involved an underlying civil lawsuit over the loss of and damage to non-contraband items seized from the plaintiffs' home after a prosecutor's office executed a search warrant in connection with an investigation that was subsequently abandoned. Ibid. We held that the articles

28

"were seized in the course of a criminal investigation, part of the State's 'criminal business' for which the State and county prosecutors are responsible pursuant to N.J.S.A. 2A:158-4," and thus the Attorney General was required to defend and indemnify the prosecutor's office's employees under the TCA. Id. at 166-67. However, we qualified that conclusion by stating that

> [t]he State's defense and indemnification of the Prosecutor's Office employees shall be subject to a reservation: if it is revealed at a later stage of this case that plaintiffs' property was stored in a facility controlled by the County and that the loss or damage to plaintiffs' property resulted from that facility's condition or maintenance, the State may seek reimbursement of all or part of the costs incurred in its defense and indemnification of the Prosecutor's Office employees.
>
> [Id. at 167.]

Lavezzi is remarkable for its recognition that some factual settings call for more nuance than others. That reservation allowed for the development of more facts that might push the act or omission more clearly into the realm of administrative responsibility -- facility maintenance -- for which the county should bear responsibility. The act or omission then would not be a part or an aspect of prosecutorial performance over which the State would exercise supervision, even though evidence retention relates to the prosecution of the criminal laws.

29

Yet, the decision in <u>Lavezzi</u> hews to the obligation of the State, consistent with <u>Wright</u>, to provide defense and indemnification to county prosecutors' offices and their personnel for acts and omissions in connection with their law enforcement duties, reiterating that the test should be understood as "whether the act or omission of the county prosecutor's office and its employees that gave rise to the potential liability derived from the prosecutor's power to enforce the criminal law, and constituted an exercise of that power." <u>Id.</u> at 178.

## IV.

Applying those principles here, it appears that two categories of error plagued the Attorney General's approach to the requests for defense and indemnification submitted in connection with the underlying federal action.

First, the Attorney General, and the Appellate Division, did not give proper regard to the nature of the <u>Directive</u> that was to guide petitioners in this matter. Because this was a law enforcement officer accused of domestic violence on multiple occasions, the normal rules governing the return of seized weapons to an alleged perpetrator were superseded by specialized guidelines vesting prosecutors with crucial discretionary decisions. Although one could say that all Attorney General directives involve guidance on law enforcement

30

to some degree, this Directive stands apart in its charge of responsibility to prosecutors.

Briefly, by way of background, as the State's chief law enforcement officer, the Attorney General has been given statutory authority to guide law enforcement entities, N.J.S.A. 52:17B-98; that authority has been used "to adopt guidelines, directives, and policies" for law enforcement in this State. See N. Jersey Media Grp., Inc. v. Township of Lyndhurst, 229 N.J. 541, 565 (2017).

The Attorney General issued Attorney General Law Enforcement Directive No. 2000-3 to promote the uniform and expeditious handling of domestic violence issues involving a special subset of individuals: law enforcement officers -- individuals who are authorized to carry state-issued weapons in the cause of law enforcement.

As the Appellate Division noted, N.J.S.A 2C:25-21(d)(1) broadly covers seized weapons taken from any domestic violence perpetrator and addresses the means for the weapons' ultimate return to their owner via a civil proceeding. In contrast, the Directive specifically details a unique series of procedures to be followed when an act of domestic violence is committed by a law enforcement officer and mandates that all law enforcement agencies and law enforcement officers authorized to carry firearms comply with the

31

The Directive is particularly geared to a specialized enforcement of the domestic violence laws as they intersect with officers of the law. The Directive's instructions are vitally important because the Attorney General is rightfully concerned about the care and circumspection necessary for a fair and correct decision about whether to re-arm a law enforcement officer accused of domestic violence. Accordingly, the Attorney General devised uniform procedures that require the county prosecutor's personnel to act in the role of a neutral assessor of the propriety of re-arming an officer in those circumstances and not leave such decisions entirely to colleagues with whom the officer serves. It is, in essence, a form of specialized enforcement of the domestic violence law as it relates to a subset of individuals.

In relevant part, the Directive clearly establishes the protocols a local prosecutor should follow when a law enforcement officer is alleged to have committed an act of domestic violence. In carrying out the Directive's mandate to remove weapons from an officer accused of domestic violence, investigate that officer, and make a determination as to the return of those weapons, the prosecutor is empowered with the ability to use discretion.

After an incident of alleged domestic violence, the officer's weapons are to be seized by the responding officer if there is a reasonable belief that the

32

presence of weapons puts the victim at risk of serious bodily injury, or surrendered by the officer when and if they are served with a domestic violence restraining order. The Directive details the procedure for informing the accused officer's supervisor, as well as the county prosecutor.

Once informed of the removal of the weapon, the prosecutor is required to be involved in the investigatory process of determining if and when return of those weapons is appropriate. If an accused officer possesses a department-issued service weapon, it is to be returned to the issuing department. All other weapons personally owned are to be forwarded to the prosecutor's office in the county in which they were seized, pursuant to guidance issued in the Attorney General's Guidelines on Police Response Procedures in Domestic Violence Cases and the provisions of N.J.S.A. 2C:25-21(d).

Once the weapons have been removed, prosecutors are required to investigate the incident and determine whether the officer should be permitted to carry a weapon, and if so, whether any restrictions should be imposed. Notably, the Directive also requires the chief of the agency employing the officer to conduct a separate investigation into the officer's background and to make a recommendation to the appropriate county prosecutor whether the officer should be allowed to carry weapons, but it places the ultimate determination of the return of weapons in the hands of the prosecutor. Even

33

when domestic violence charges are dismissed or withdrawn, or no charges are filed at all, a prosecutor has the discretion to authorize or deny return of the seized weapons and may subject that return to any conditions the prosecutor deems necessary. Only an existing court order to the contrary would limit the prosecutor's discretion in that regard.

The Directive thus imposes on the county prosecutor numerous, important discretionary decisions related to the removal and return of service weapons by law enforcement officers within their jurisdiction. The prosecutor's involvement, however, is dependent in part upon the actions of responding officers when first informed of claims of domestic violence against members of the police force. Because the prosecutor's mandate to carry out the Directive can be thwarted by improper police action at that early stage, the prosecutor's office must offer training and supervision with respect to enforcement of this particular Directive.

We view that training and supervision, as well as the many discretionary determinations the Directive assigns to the prosecutor, as part of the State-delegated responsibility to enforce the law that the Attorney General has entrusted to prosecutors. It is not akin to the administrative duties that have been exempted from State defense and indemnification in the past, such as employment actions, which related to the internal operations of the

34

prosecutor's office.  Nor is it a county responsibility such as facility provision and maintenance for evidence storage, which <u>Lavezzi</u> left open as a possible exclusion.

The Attorney General took too narrow an approach to the prosecutorial law enforcement function here.  The administrative determinations did not credit the nuanced, discretionary decisions that prosecutors are called on to make in the re-arming of police officers such as Seidle.  The decisions of the MCPO defendants who considered whether Seidle could be re-armed and then remain armed were prosecutorial functions exercised on behalf of the State.  As such, those determinations, as well as the claims of improper training and supervision of Neptune law enforcement with respect to implementation of the <u>Directive</u>, were entitled to defense and indemnification by the State.

The second error permeating the decisions under review is the manner in which the Attorney General parsed each iteration of the complaint here, scouring them paragraph by paragraph, at times within a paragraph, to eliminate bases for defense and indemnification.  That crabbed approach toward the provision of defense and indemnification is not in keeping with the thrust of <u>Wright</u>.  The prosecutorial function should be covered, and the State is given control over the whole defense to ensure that the defense in such settings is not compromised by lack of coordination, or worse, inconsistency in

35

position.  Petitioners rightly contend that the Attorney General's review made it difficult to defend the complaint.

Moreover, the Attorney General's inconsistency in its review of these sequentially filed complaints renders the decisions arbitrary and unreasonable. The Attorney General's third and fourth decisions about defense and indemnification seem to have been influenced by the federal court's actions dismissing a claim based on state action that was entitled to sovereign immunity and the pleading gymnastics that plaintiffs were attempting in their effort to avoid the Eleventh Amendment consequences of matters being deemed law enforcement.  The pleading dilemma plaintiffs face is separate and apart from whether petitioners are entitled to have a defense provided for them either by the State or at State expense as the federal litigation unfolds.

In sum, in this case, all claims related to petitioners' acts or alleged omissions associated with duties imposed by the Directive constitute state prosecutorial functions.  We agree with the Appellate Division that on remand a trial court should assess the reimbursement due to petitioners based on our reversal in this respect.

## V.

The judgment of the Appellate Division is reversed, and this matter is remanded to the Law Division for proceedings consistent with this opinion.

36

CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion.